**CHESAPEAKE BAY FOUNDATION, et al., Plaintiffs,**

v.

**GWALTNEY OF SMITHFIELD, LTD., Defendant.**

Civ. A. No. 84–0366–R.

United States District Court, E.D. Virginia, Richmond Division.

June 26, 1985.

Jeter M. Watson, Chesapeake Bay Foundation, Richmond, Va., James Thornton, Natural Resources Defense Council, Inc., New York City, Ann Powers Gailis, Scott Burns, Chesapeake Bay Foundation, Inc., Annapolis, Md., for plaintiffs.

H. Woodrow Crook, Jr., Smithfield, Va., Anthony F. Troy, James E. Ryan, Jr., George A. Somerville, Mays, Valentine, Davenport & Moore, Richmond, Va., for defendant.

J. Robert Brame, III, McGuire, Woods & Battle, Richmond, Va., for Ralston.

### MEMORANDUM

MERHIGE, District Judge.

Before the Court is the question of the amount that ought to be assessed, in civil penalties, against defendant for polluting Virginia's waters in violation of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* (the "Act"). The Court has already determined, in granting plaintiffs' motion for partial summary judgment on the issue of liability, that defendant has violated the Act; the parties do not now contest liability. They do, however, differ over (i) defendant's maximum liability for its violations; and (ii) the appropriate penalty for those violations. Plaintiffs contend that defendant is subject to a maximum of $8,300,000 in civil penalties, and that the full measure of liability should be imposed. Defendant, on the other hand, contends that it is subject to a maximum of about $980,000 in civil penalties, and that the Court should assess somewhere between $12,000 and $20,000.

Defendant also vigorously contests the Court's subject-matter jurisdiction over this lawsuit. First, it argues that plaintiffs do not have standing to prosecute this action. Second, it argues that the statute does not authorize citizen suits against defendants who are not discharging unlawfully when the suit is filed.

1. NPDES Permit No. VA 0002844.

2. Those pollutants are: (i) fecal coliform; (ii) chlorine (Cl₂); (iii) total suspended solids (TSS);

Following trial, defendant sought and received the Court's leave to file a post-trial memorandum; about a month thereafter, defendant filed that memorandum. Plaintiffs filed a short response, and also had filed a trial memorandum on the day prior to trial. Several months later, defendant filed a motion to dismiss based on its argument that a continuing violation is required, which has been fully briefed. All the foregoing matters are now ripe for disposition.

### BACKGROUND

This suit is a citizen enforcement action—a "citizen suit"—authorized by Section 505 of the Clean Water Act, 33 U.S.C. § 1365. Plaintiffs are two non-profit corporations dedicated to protecting natural resources: the Chesapeake Bay Foundation (CBF), a regional environmental group with over 19,000 members residing in the Chesapeake Bay area, including Virginia; and the Natural Resources Defense Council (NRDC), an environmental group with members throughout the nation, including over 800 members in Virginia. Defendant, Gwaltney of Smithfield, Ltd. (Gwaltney), is in the business of processing and packing pork products. It is a subsidiary of Smithfield Foods, Inc. (Smithfield Foods). Gwaltney's plant, the operation of which is the subject of this lawsuit, is situated on the Pagan River near Smithfield, Virginia. In the course of its production, the plant discharges wastewater into that river.

At all times material hereto, Gwaltney was allowed to discharge various pollutants from that plant into the river—within certain limits, as set out in a "National Pollution Discharge Elimination System" (NPDES) permit.[1] Such permits are issued pursuant to procedures and regulations under the Clean Water Act. *See* 33 U.S.C. § 1342.

From October 27, 1981 until May 15, 1984, Gwaltney's plant exceeded its discharge limitation for a variety of pollutants[2] on a number of occasions. Gwalt-

(iv) total Kjeldahl nitrogen (TKN); and (v) oil and grease.

ney itself reported these violations in its discharge monitoring reports (DMRs), as required by law.[3] Prior to October 27, 1981, Gwaltney was not responsible for the pollution discharges from the plant at issue here. Instead, ITT–Gwaltney, Inc. (ITT–Gwaltney) owned the plant and was responsible. Under ITT–Gwaltney as well as under Gwaltney, the plant repeatedly exceeded a number of its NPDES discharge limitations. Gwaltney acknowledges that it was aware of ITT–Gwaltney's record of non-compliance. Only the violations subsequent to Gwaltney's assumption of responsibility on October 27, 1981, are at issue here, however.

The violations reported in Gwaltney's DMRs form the basis of this action. Where a permittee is in violation of an NPDES discharge limitation, it is also "in violation of ... an effluent standard or limitation under [the Act]," 33 U.S.C. § 1365(a)(1), which makes the permittee subject to citizen suits. *Id.* For citizen suits under the Clean Water Act, Congress has authorized the district courts to assess appropriate civil penalties. 33 U.S.C. § 1365(a). Such penalties may be as high as "$10,000 per day of such violation." 33 U.S.C. § 1319(d).

DISCUSSION

*I. Standing.*

▇ At the outset, the Court must dispose of defendant's contention that plaintiffs have no standing under either the Act or Article III of the Constitution. Standing is an element of jurisdiction over the subject matter. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 494–95, 95 S.Ct. 2197, 2203, 45 L.Ed.2d 343 (1975). Thus, if plaintiffs have no standing, then the Court may not proceed further. *See id.*

Gwaltney contends that plaintiffs' allegations are insufficient to establish standing for CBF and NRDC to sue in their own right. It then acknowledges that the allegations of standing in the complaint, taken alone, might be sufficient for CBF and NRDC to sue on behalf of some of their members. But Gwaltney argues that no such standing has been established because plaintiffs did not present evidence of standing at trial, even though Gwaltney denied plaintiffs' standing allegations in its answer and Gwaltney's counsel demanded prior to trial that plaintiffs' counsel establish at trial that plaintiffs meet the Clean Water Act's standing requirements as articulated in *Sierra Club v. SCM Corp.,* 747 F.2d 99 (2d Cir.1984). Plaintiffs, on the other hand, argue that they have established standing to sue both in their own right and on behalf of their members. As for standing to sue for their members, they refer to the Court's findings in granting them summary judgment on the issue of liability, as well as to a number of affidavits they have filed at different stages of the litigation.

▇ It is clear that, at least under the Clean Water Act,[4] a citizen enforcer can only establish standing if it meets the requirements of "injury in fact" set forth in *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). *See, e.g., Sierra Club v. SCM Corp.,* 747 F.2d 99, 107 (2d Cir.1984). An organizational plaintiff, such as CBF or NRDC, can establish "injury in fact" through injury to their members as well as through injury to the organization itself. *See, e.g., Sierra Club v. Morton,* 405 U.S.

---

3. Section 1318(a)(3)(A) of Title 33 mandates, among other things, that the Administrator of the Environmental Protection Agency "require the owner or operator of any point source" to establish and maintain such records of effluent discharges and to make such reports as the Administrator may "reasonably require." Currently, permittees under the Clean Water Act must submit DMRs. *See* 40 C.F.R. § 122.-41(1)(4) (1984). Such reports are public information, by statute. *See* 33 U.S.C. § 1318(b)(2).

4. Standing requirements may be more lenient for citizen enforcers suing under the citizen suit provisions of other environmental statutes, where—unlike the Clean Water Act § 505(g), 33 U.S.C. § 1365(g)—there is no limitation of "citizen" to a person "having an interest which is or may be adversely affected." *See, e.g.,* Clean Air Act § 304(a), 42 U.S.C. § 7604(a) (1982) ("any person" can sue); *Metropolitan Washington Coalition for Clean Air v. Washington, D.C.,* 511 F.2d 809, 814 (D.C.Cir.1975) (discussing standing requirements under the Clean Air Act).

at 739, 92 S.Ct. at 1368. The parties do not dispute these basic principles of standing.

■ The Court need not consider the dispute over whether plaintiffs have established standing to sue in their own right, because it concludes that they have established standing to sue on behalf of their members. They established such standing when the Court granted their motion for summary judgment on the issue of liability. In support of that motion, plaintiffs included an affidavit of one of their counsel stating:

> Members of CBF reside in Virginia, in the vicinity of the Pagan River, and recreate in, on, or near, and otherwise use or enjoy the Pagan River and the water system of which it is a part.... The interests of CBF and of CBF's members have been, are being, and will be adversely affected by [Gwaltney's] failure to comply with its NPDES permit requirements.

The affidavit included an identical paragraph about members of NRDC. Defendant failed to dispute this in any way at the summary judgment hearing, although it had raised the standing issue at the pleading stage.[5] Indeed, Gwaltney failed to file any response whatsoever to plaintiffs' motion for summary judgment, despite the fact that two months had elapsed between the filing of plaintiffs' motion and the hearing on it. In granting plaintiffs' motion the Court specifically stated, in its findings of fact from the bench, that plaintiffs have standing to prosecute this action.

Apparently, Gwaltney believes that any showing of standing that plaintiffs may have made previously is insufficient in light of a recent decision by the Court of Appeals for the Second Circuit, *Sierra Club v. SCM, supra,* 747 F.2d 99, construing standing requirements under the Clean Water Act. Gwaltney suggests that the case establishes a requirement that plaintiffs identify affected members in order to establish standing under the Act. The Court does not agree, however.

In *Sierra Club v. SCM,* the issue pertaining to standing before the Court of Appeals was whether the Sierra Club, solely on the basis of its "institutional interest in the preservation of the environment," could sustain "injury in fact" for standing purposes in a citizen suit under the Clean Water Act. *See Sierra Club v. SCM, supra,* 747 F.2d at 103. Writing for a unanimous panel, Judge Kearse rejected Sierra Club's contention. After carefully reviewing the legislative history of the Act, she concluded that the Sierra Club could only establish standing by showing actual injury within the meaning of *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and that the Sierra Club's "institutional interest" was insufficient in that regard. *Id.* at 107. She further held that an organizational plaintiff can satisfy the actual injury requirement by "providing a concrete indication" that the organization or "one or more of its members" use the waterway into which the defendant discharges its wastes or would be adversely affected by the pollution of that waterway. *Id.*

■ Despite defendant's suggestion to the contrary, Judge Kearse did not hold that a plaintiff organization must identify its injured members in order to provide the requisite "concrete indication." It is true, of course, that the district judge had dismissed the complaint—at least in part—because the Sierra Club refused to identify any injured member. *See Sierra Club v. SCM Corp.,* 580 F.Supp. 862, 865 (W.D.N.Y.1984). Despite the controversy in the district court over Sierra Club's refusal to identify members, though—of which the Court of Appeals was well aware, *see Sierra Club v. SCM, supra,* 747 F.2d at 102— the Court of Appeals carefully avoided holding that an organization suing under the Clean Water Act must identify injured members in order to establish standing through them. Instead, Judge Kearse— noting that the Sierra Club had submitted

---

**5.** Gwaltney filed a document titled "Answer and Motion to Dismiss," in which it denied plaintiffs' standing allegations in its "Third Defense." The answer and motion were unaccompanied by any documents that might create a genuine issue of material fact as to plaintiffs' standing, however.

an affidavit indicating merely that some of its members lived within a seventy-mile radius of the polluting plant—chose more general language to describe the requisite showing for standing: a "concrete indication" that one or more members "used the [waterway involved] or would be affected by its pollution." Plaintiffs here have satisfied this standard. The unopposed affidavit of plaintiffs' counsel quoted *supra*, which indicates that members of plaintiffs' organization use the river into which defendant discharges its wastes, is sufficient to establish plaintiffs' standing under the Clean Water Act.[6]

## II. Continuing Violation.

Gwaltney also argues that the Court has no jurisdiction over this suit because Gwaltney was not in violation of its NPDES permit when the complaint was filed, or subsequently. Gwaltney contends that the Clean Water Act's citizen suit provision only confers jurisdiction where the polluter is engaged in an ongoing violation; where the violation occurred entirely in the past, Gwaltney urges that there is no jurisdiction. Plaintiffs contend, on the contrary, that citizens can sue regardless of whether the polluter's unlawful conduct was continuing at the time the suit was filed.

The dispute is one of statutory construction. Gwaltney's argument centers around the portion of the Clean Water Act's citizen suit provision that reads, in pertinent part:

> ... any citizen may commence a civil action on his own behalf—
> (1) against any person ... who is alleged *to be in violation* of (A) an effluent standard or limitation under this chapter....

33 U.S.C. § 1365(a)(1) (emphasis added). Gwaltney points out that the statute does not include the words "to have violated," and argues that the statute therefore only authorizes citizen suits against polluters whose unlawful conduct is occurring at the time the suit is filed.

In analyzing whether Gwaltney's position is correct, the Court begins with the familiar principal that it need not consider a statute's legislative history where the statutory language itself is clear. *See, e.g., Ex Parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949). Despite Gwaltney's protestations to the contrary, the Court does not believe that the statutory language on which Gwaltney rests its argument clearly supports Gwaltney's position. Other courts besides this one have perceived ambiguity in the statutory language at issue. *See Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, 600 F.Supp. 1474, 1476 (D.N.J.1985); *Sierra Club v. Raytheon*, 22 Env.Rep. Cases 1050, 1054 (D.Mass.1984). The words "to be in violation" may reasonably be read as comprehending unlawful conduct that occurred solely prior to the filing of the lawsuit as well as unlawful conduct that continues into the present. For example, a person who under-pays taxes one year remains "in violation" of the relevant tax laws, even though that person pays the proper amount of taxes for the following year. Similarly, a polluter that exceeds various discharge limitations in its NPDES permit, such as Gwaltney, arguably remains "in violation" with respect to those excesses, even though in subsequent years it brings itself into compliance. Indeed, its discharge violations remain on the records, and the effects of the excess discharges may linger well after they occur.

In addition to the ambiguity in the words "to be in violation" standing alone, other portions of Section 1365 suggest that Gwaltney's proffered construction is not the only—or the most—plausible one. Section 1365 states that:

> The district courts shall have jurisdiction ... to apply any appropriate civil penalties under [33 U.S.C. § 1319(d) ].

33 U.S.C. § 1365(a). Section 1319(d) authorizes civil penalties "not to exceed $10,000 per day of ... violation." 33 U.S.C.

---

**6.** In any event, plaintiffs did ultimately name members. In their response to defendant's post-trial memorandum, plaintiffs attached the affidavits of three affected members who indicated specifically how they used the Pagan River (or the Chesapeake Bay into which it flows), and how they are adversely affected by the pollution of the Pagan River.

§ 1319(d). Neither Section 1319(d) nor the citizen-suit provision itself expressly limits the imposition of such civil penalties to polluters that persist in their unlawful conduct up to the time the complaint is filed. On the contrary, the absence of any such limitation implies that Congress intended to authorize citizen suits to recover civil penalties based on a polluter's unlawful conduct in the past, regardless of whether the polluter has ceased its unlawful conduct by the time the citizen suit is brought. In the Court's view, the statutory language, fairly read, suggests that the Act authorizes citizen suits for civil penalties based on unlawful conduct that occurred in the past, regardless of whether a polluter is in compliance when the suit is brought.

In view of the ambiguity of the statutory language, however, the Court has also reviewed relevant portions of the legislative history in order to better understand Congress's intent. The committee reports do not expressly address the issue at hand one way or another. They do, however, note that the statute authorizes the recovery of civil penalties in citizen suits. The reports do not discuss any requirement that such suits must be based on unlawful conduct occurring at the time the suit is filed. *See* H.Rep. No. 911, 92d Cong., 2d Sess. 133 (1972), *reprinted in* 1 *A Legislative History of the Water Pollution Control Act Amendments of 1972* at 820 (1973) (hereinafter "Legislative History"); S.Rep. No. 414, 92d Cong., 1st Sess. 79, *reprinted in* 2 *Legislative History* at 1497. As already referred to, the absence of any discussion of such a requirement—in the context of acknowledging the general availability of civil penalties—implies that such a requirement was never contemplated.

The legislative history provides direct support, as well as support by implication, for the view that the Clean Water Act authorizes citizen suits based on unlawful conduct that occurred in the past regardless of whether the conduct continues through the time the complaint is filed. Senator Muskie, the manager in the Senate of the bill that added the citizen suit provision to the Act, stated:

> ... a citizen has a right under Section 505 to bring an action for an appropriate remedy in the case of *any person who is alleged to be, or to have been, in violation, whether the violation be a continuous one, or an occasional or sporadic one.*

*See* 118 *Cong.Rec.* 33,700, *reprinted in* 1 *Legislative History* at 179 (emphasis added). Gwaltney acknowledges that Senator Muskie's remark supports plaintiff's position and undermines its own. But it attempts to eliminate the force of his explication by noting that it is the remark of only an individual legislator. To be sure, a court cannot allow colloquies among legislators to materially alter clear statutory language. *See, e.g., Regan v. Wald,* —— U.S. ——, ——, 104 S.Ct. 3026, 3035, 82 L.Ed.2d 171 (1984). But such is not the case here. Rather, Senator Muskie's remark lends further support to a plausible reading—and one which is uncontradicted by the statute itself and other legislative materials[7]—of ambiguous statutory language.

A reading of the citizen-suit provision that would authorize suits for civil penal-

---

**7.** Gwaltney also quotes a remark of Senator Bayh in support of its position. Senator Bayh's remark is as follows:

> These sorts of citizen suits—in which a citizen can obtain an injunction but cannot obtain money damages for himself—are a very useful additional tool in enforcing environmental protection laws.

1 *Legislative History* at 221. Gwaltney argues that the fact that Senator Bayh did not mention civil penalties—and did mention injunctive relief—somehow indicates that Senator Muskie's explication was an inadvertent misstatement. The Court disagrees. Senator Bayh's statement hardly contradicts Senator Muskie's explication.

It is, rather, an accurate statement of a citizen-enforcer's remedies under the Clean Water Act with respect to injunctions and money damages—and simply does not address the circumstances when a citizen suit for civil penalties may be maintained.

Gwaltney also calls attention to occasional references in the legislative history to "abatement" actions. *See* S.Rep. No. 414, 92d Cong. 1st Sess. 79–82, *reprinted in* 2 *Legislative History* at 1497–1500. Such references, however, do not persuade the Court that abatement of continuing unlawful conduct was the only avenue of relief Congress contemplated when it authorized citizen suits under the Act. *See Student Public*

ties against polluters for past unlawful conduct regardless of their compliance status when the suit is filed is also consistent with one of the primary policy objectives inherent in the concept of citizen suits: deterrence of violations. Indeed, unless citizens may sue for civil penalties in such circumstances, citizen suits would provide little, if any, additional incentive for polluters to comply with their discharge limitations until a citizen suit is actually commenced. *See also Monsanto, supra,* 600 F.Supp. at 1476–77; *Sierra Club v. Aluminum Company of America,* 585 F.Supp. 842, 854 (N.D.N.Y.1984).

If citizen suits under the Act were limited to situations where the polluter is engaged in unlawful conduct when the suit is filed, the deterrence effect of citizen suits would also be undermined by the evidentiary difficulties citizen enforcers would fact in establishing that a polluter is currently discharging unlawfully. As the Senate Report recognized, one of the keys to the successful functions of the Act's citizen suit provision is disclosure of a polluter's discharge information. *See* S.Rep. No. 414, 92d Cong., 1st Sess. 81 (1971) *reprinted in* 2 *Legislative History* at 1499 ("The information and other disclosure provisions required throughout the bill are important to the operation of this provision."). And, indeed, Gwaltney's DMRs form the basis of this lawsuit. But, as plaintiffs have pointed out, such reports are not available until at least a month—and sometimes more—after the discharge occurs. Gwaltney's proffered construction of the Act would engage the litigants in discovery battles over whether a polluter is no longer discharging unlawfully; and it would engage the courts in a search for standards to apply in determining whether a polluter's conduct can fairly be viewed as continuing in violation. *See Hamker v. Diamond Shamrock Chemical Co.,* 756 F.2d 392, 399 (5th Cir. 1985) (Williams, J., concurring) (attempting to define what constitutes "in violation"); *Friends of the Earth v. Facet Enterprises, Inc.,* 22 Env.Rep. Cases 1143, 1145 n. 1 (W.D.N.Y.1984) ("... it is difficult for a plaintiff to verify that a violation is occurring at the very time that plaintiff is filing a notice of intent to sue.... I am not prepared to draw a line that Congress has not drawn, defining the point at which violations are sufficiently "recent" to form the basis for a citizen suit. To my mind, that line has been drawn already [by the relevant statute of limitations]."). Such a situation would also be contrary to Congress's understanding that citizen suits involve "manageable and precise benchmarks for enforcement." S.Rep. No. 92–414, 1st Sess. 81 (1971), *reprinted in* 2 *Legislative History* at 1499.[8]

---

*Interest Research Group of New Jersey v. Monsanto Co.,* 600 F.Supp. 1474, 1476 (D.N.J.1985).

**8.** The problem of determining whether a violation is a "continuing" one is highlighted well in this case. Plaintiffs filed this suit in mid-June of 1984. With a history of violations of its TKN limitations in the wintertime, Gwaltney had just experienced another winter of repeated violations of its TKN limitations, despite the changes it had implemented in its wastewater treatment system to address the problem. At the time of trial in December of 1984, one of Gwaltney's own witnesses—Mr. Sneed—expressed doubt as to whether Gwaltney would meet its TKN limitations. It was not until Gwaltney had experienced a full winter without problems that it could make its motion to dismiss based on its present compliance, with a secure belief that it was indeed in compliance. Thus, plaintiffs' allegation in the complaint, that Gwaltney was continuing to violate its NPDES permit when plaintiffs filed suit appears to have been made fully in good faith. On these facts, the Court believes that even if Gwaltney were correct that a district court has no jurisdiction over citizen suits based entirely on unlawful conduct that occurred entirely in the past, the Court would still have jurisdiction here. A useful analogy is the manner in which the federal courts treat the jurisdictional amount requirement in diversity cases. Gwaltney has raised this analogy in support of its position that the Court is without jurisdiction here. The Court disagrees, and concludes that the analogy supports the position that it does have jurisdiction here.

In diversity cases, the question whether the jurisdictional amount is satisfied—and whether the court, ultimately, has jurisdiction—is not answered by whether the plaintiff ultimately recovers in excess of $10,000. *See, e.g.,* 14A C. Wright, A. Miller, E. Cooper, *Federal Practice & Procedure* § 3702 at 31–33, and cases cited (1985). Rather, the issue is whether the amount plaintiff *stated in the original claim* satisfies the amount, and is made in good faith. *See,* e.g., *Wiggins v. North Carolina Equit. Life Assur. Co.,* 644 F.2d 1014, 1016–17 (4th Cir.1981). As

In light of the language of the Clean Water Act's citizen suit provision, its legislative history, and its underlying policy goals, the Court concludes that the Clean Water Act authorizes citizen suits for civil penalties for violations of the Act, regardless of whether the polluter is engaged in unlawful conduct at the time the suit is filed or afterward. A number of other courts have recently reached the same conclusion. *See, e.g., Monsanto, supra,* 600 F.Supp. at 1476–77; *Aluminum Company of America, supra,* 585 F.Supp. at 853–54; *Sierra Club v. Raytheon, supra,* 22 Env. Rep. Cases at 1054; *Student Public Interest Research Group of New Jersey v. Anchor Thread Co.,* 22 Env.Rep. Cases 1150, 1154 (D.N.J.1984); *see also Student Public Interest Research Group of New Jersey v. Tenneco Polymers,* 602 F.Supp. 1394, 1398–99 (D.N.J.1985); *Facet Enterprises, supra,* 22 Env.Rep. Cases at 1145 n. 1.

Gwaltney is not, however, without authority for its position. It relies heavily on *Hamker v. Diamond Shamrock Chemical Co.,* 756 F.2d 392 (5th Cir.1985). In that case, the Court of Appeals for the Fifth Circuit held that a person cannot maintain a citizen suit under the Clean Water Act unless the polluter's conduct is unlawful at the time the suit is filed, and cannot be brought for civil penalties for past violations. *Id.* at 396. This Court, respectfully, disagrees.

First, the Court notes that the panel concluded the statutory language is not sufficiently ambiguous to raise any question about its proper meaning. *See id.* at 395. As discussed *supra,* however, this Court—and several others—have examined the language without being able to resolve its plain meaning with the same degree of certainty.

Second, the *Hamker* panel reasoned that because the statutory scheme centers primary enforcement responsibility with the states and the Administrator of EPA, citizens are not authorized to sue polluters unless the polluter is engaged in ongoing unlawful conduct. *Id.* at 395–96. But this Court does not comprehend how the conclusion necessarily follows from the premise. For, even if the statute is construed to allow citizens to sue for past violations, primary enforcement responsibility remains with the states and the administrator: generally, citizens must first notify the states, the administrator, and the alleged polluter and wait sixty days to give public enforcement authorities the opportunity to act before proceeding. *See* 33 U.S.C. § 1365(b)(1)(A). The panel also reasoned that because the statute requires the citizen-enforcer to notify the violator—as well as enforcement authorities—of its intent to sue, the statute contemplates that a citizen loses the right to sue if the violator brings itself into compliance before the sixty days elapses, just as the citizen loses the right to sue if the governmental authorities commence prosecution in a court before sixty days elapses. *Id.* at 396. This reasoning is unpersuasive. The statute expressly provides that public enforcement within the sixty-day period precludes a citizen suit, *see* 33 U.S.C. § 1365(b)(1)(B), but does not anywhere state that the violator's compliance within the sixty-day period deprives a citizen of the right to sue. It thus appears inappropriate to infer that compliance by the violator carries the same consequences for citizen enforcement as initiation of a government enforcement action [9].

Gwaltney recognizes, the test of good faith is whether it appears to be a "legal certainty" that the jurisdictional fact is not satisfied. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938); *Wiggins, supra,* 644 F.2d at 1016–17. But there was no certainty here—legal, factual, or otherwise—that Gwaltney's system would correct one of the two major violation problems for which this suit was brought—until nearly one year after the suit was filed.

9. The Court also notes that the committee reports, as well as the statute itself, do not indicate that one of the purposes of the sixty-day notice requirement is to give a violator the opportunity to come into compliance and avoid liability. *See* H.Rep. No. 911, 92d Cong., 2d Sess. 133 (1972), *reported in* 1 *Legislative History,* at 820; S.Rep. No. 414, 92d Cong., 1st Sess. 79–80 (1971), *reprinted in* 2 *Legislative History* at 1497–98. Rather, the sole purpose appears to be to "encourage and provide for agency enforcement." S.Rep. No. 414, 92d Cong., 1st Sess. 79 (1971), *reprinted in* 2 *Legislative History* at 1497.

Finally, the *Hamker* panel reasoned that construing the provision to preclude citizen suits for civil penalties based on past violations would promote the goal of limiting the burden on the federal courts. But this Court is not persuaded that such a construction would ultimately reduce the federal judiciary burden. If such a construction were adopted, citizen suit provisions would provide an incentive for compliance only in those specific cases where the citizen-enforcer actually files a notice of intent to sue and then a complaint. The threat of citizen suits would have little general deterrent effect. It is not unreasonable to presume that under such a system, noncompliance would be more widespread than under a system where it is clear that citizens can sue for civil penalties for past violations. If the number of citizen suits is related to the level of noncompliance—a reasonable assumption—then it may well be that the number of suits actually filed per period of time would be greater under a system in which citizens cannot sue for civil penalties for past violations.

In considering the persuasiveness of *Hamker*, this Court also notes that the *Hamker* panel did not address the legislative history militating against its construction of the statute. As discussed *supra,* the legislative history corroborates the view that citizens can sue for civil penalties for past violations.

Gwaltney also relies on *City of Evansville, Indiana v. Kentucky Liquid Recycling,* 604 F.2d 1008 (7th Cir.1979), *cert. denied sub nom Louisville and Jefferson County Metropolitan Sewer District v. City of Evansville, Indiana,* 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980). In that case, the Court of Appeals for the Seventh Circuit remarked that the Clean Water Act "does not provide for suits

against parties alleged to have violated an effluent standard or limitation in the past or for recovery of damages." *Id.* at 1014. That remark, however, insofar as it can be said to address citizen suits for civil penalties for past violations, is only *dicta.* The issue in the case was whether citizen suits may be brought for damages. The panel did not at all analyze whether the statute authorizes citizen suits for civil penalties for past violations.[10] The case of *Pawtuxet Cove Marina v. Ciba-Geigy Corp.,* 21 Env.Rep. Cases 1393 (D.R.I.1984), which Gwaltney also cites, relies primarily on *City of Evansville* to reach its conclusion. *See id.* at 1394 (referring to cases cited in magistrate's decision, 21 Env.Rep. Cases 1390, 1391). Accordingly, the Court does not find the case to be persuasive.

Finally, Gwaltney relies on *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). Gwaltney focuses on Justice Powell's observation that "this provision allows suits under the Act by private citizens, but authorizes only prospective relief...." *Id.* at 6, 101 S.Ct. at 2619. This observation, however, like the remark of the Seventh Circuit in *City of Evansville,* arose in the context of whether a citizen enforcer may sue for damages. The Supreme Court, like the Seventh Circuit, concluded that one may not. Later in the opinion it did recognize that civil penalties are authorized in citizen suits. *See id.* at 14 n. 25, 101 S.Ct. at 2623 n. 25. It had no occasion to consider or remark about whether a citizen enforcer may sue a polluter for civil penalties based on past violations.

### III. Maximum Liability.

The number of days during which a polluter violates a limitation in its permit sets

---

**10.** Plaintiffs argue that a case decided by the Court of Appeals for the Seventh Circuit subsequent to *City of Evansville* implicitly rejects the position with respect to citizen suits based on past violations that *City of Evansville* took. That case, *People of the State of Illinois v. Outboard Marine Corporation, Inc.,* 680 F.2d 473 (7th Cir.1982), is not as on point as plaintiffs argue. The case does reflect the understanding that the United States can sue under the Clean

Water Act for injunctive and other relief based on past discharges, regardless of a polluter's present compliance. *See id.* at 480–81. It also reflects the understanding that citizens may intervene in such cases. *Id.* at 480. It simply does not address the question whether citizens themselves can sue for civil penalties based on a polluter's unlawful conduct, that occurred entirely in the past, however.

the polluter's maximum liability in civil penalties for violating that limitation. The subsection of the Clean Water Act authorizing civil penalties states that a polluter in violation of, among other things, permit limitations such as those forming the basis of this suit "shall be subject to a civil penalty not to exceed $10,000 per day of such violation." 33 U.S.C. § 1319(d). Determining the number of days involved in a given violation is thus an important aspect of assessing civil penalties. Determining whether, and in what circumstances, a polluter can be subjected to a penalty of greater than $10,000 per day for permit violations is also important. The parties dispute the law on both points.

*A. Number of days involved for violating a monthly average.* Gwaltney has violated its "monthly average" permit limitations for several substances on a number of occasions. The "monthly average" of a substance reflects the average amount (or concentration, where the substance is measured by concentration instead of by amount) of the substance discharged per day, based on an average of measurements taken for that substance over the course of a month. The monthly average for the pollutants at issue in this case is roughly half of the maximum daily amount allowed.[11] Gwaltney argues that a violation

of a monthly average constitutes a single day of violation. Plaintiffs, on the other hand, maintain that a violation of a monthly average constitutes thirty days of violation.

■ As discussed above, the relevant section of the Clean Water Act authorizing civil penalties reads that: "any person who violates ... any permit condition or limitation ... shall be subject to a civil penalty not to exceed $10,000 per day of such violation." 33 U.S.C. § 1319(d). Thus, to determine the maximum authorized penalty for the violation of a monthly limitation, the Court must consider how many days are involved in such a violation. It is difficult for this Court to imagine how the violation of a monthly limitation involves any number of days other than the number of days in that month. Violating a monthly limitation, then, subjects a polluter to a maximum penalty of $300,000. Similarly, a violation of a weekly limitation would, it seems, necessarily involve seven days. At least one other district court has reached the same conclusion. *See United States v. Amoco,* 580 F.Supp. 1042, 1045 (W.D.Mo. 1984).

Although it cites neither cases nor legislative history in support of its position, Gwaltney contends that this conclusion is nevertheless wrong primarily because it believes it can be unjust.[12] To illustrate its

---

**11.** The average and maximum permit limitations for four of the pollutants at issue in this case read as follows on Gwaltney's DMR for May, 1984: (i) for TSS: 228.000 KG/D (daily average over a month), 455.000 KG/D (daily maximum); (ii) for fecal coliform: 200.0000 N/CML (daily average over a month), 400.000 N/CML (daily maximum); (iii) for TKN: 109.-0000 KG/D (daily average over a month), 219.-0000 KG/D (daily maximum); (iv) for oil and grease: 78.0000 KG/D (daily average over a month), 156.0000 KG/D (daily maximum). For chlorine, (Cl$_2$), there was no average limitation: rather, a daily minimum (1.5000 MG/L) and maximum (2.5000 MG/L) were set.

**12.** Gwaltney raises two other arguments against treating the violation of a monthly limitation as a thirty-day violation.

First, Gwaltney contends that to characterize a violation of a monthly limitation as thirty days of violation is contrary to the principle that penal statutes are to be construed strictly. *See, e.g., Commissioner of Internal Revenue v. Archer,* 361 U.S. 87, 91, 80 S.Ct. 144, 147, 4 L.Ed.2d

127 (1959). Adhering to this proposition does not affect the Court's conclusion. The words of the statute authorize a penalty of up to $10,000 "per day of such violation." Because a violation of a monthly limitation necessarily involves a violation over an entire month, a maximum penalty of $10,000 per day of the month is plainly within the words of the statute and therefore does not violate any principal of strict construction.

Second, Gwaltney argues that one of the stipulations, in conjunction with the plaintiffs' response to an interrogatory, precludes plaintiffs from arguing that Gwaltney's violation of a monthly limitation subjects Gwaltney to a penalty for every day of the month. The parties stipulated that 160 violations had occurred, and plaintiffs had indicated in response to an interrogatory that "the total dollar amount of civil penalties" they would seek would be "$10,000 per violation." Some of the violations that were stipulated were, of course, violations of monthly limitations. Gwaltney is correct that plaintiffs now take a position on penalties that is technically inconsistent with their interrogatory re-

point, Gwaltney suggests a hypothetical: a polluter discharges, for twenty-nine days of a month, 98% of the amount that it must average each day in order to meet its monthly average; on the last day, however, the polluter discharges 180% of that amount. Because of the last day's discharge, the polluter would violate its monthly average; yet, if its permit allowed a daily maximum twice as great as the monthly average (as Gwaltney's does), the polluter would not have violated its daily maximum for the substance at all during the entire month. In Gwaltney's view, subjecting the polluter to thirty days' liability because of the monthly violation is unjust, especially in light of the fact that the polluter never exceeded its daily maximum.

The Court disagrees. Part of Gwaltney's argument is based on the suggestion that no real harm is being done where maximum daily limitations are not violated. But the mere fact that a daily maximum is not violated does not mean that the polluter's discharges are harmless. Daily maximums for the pollutants at issue are no doubt more lenient than the monthly average because the environment may be able to absorb a relatively high discharge in a single day without incident—while a substantially lower discharge over the course of a month may present an environmental problem. In any event, the water pollution authorities have established the allowable discharge levels for various time intervals in order to ensure that water quality standards are met. It is not for the district court to decide, in a citizen suit proceeding, that a permit limitation an agency has fixed is unnecessary.

Another part of Gwaltney's argument is based on the fact that only on one day did its hypothetical polluter exceed the amount that it needed to maintain each day in order to meet the month's average. But this too is unpersuasive. The average is based on discharges over the entire month. When a polluter violates a monthly average, every day of its discharges contributes to the violation, even if most of the discharges are within the average that the polluter needs to maintain in order to stay within the monthly limitation.[13]

The problem with Gwaltney's position is further illustrated when one considers a counter-hypothetical: the polluter nearly exceeds—but does not pass—its daily maximum every day of a month. Such a polluter would far exceed the monthly average, and would be liable for violating that limitation. But Gwaltney's position, if adopted, would constrain a court to treat such conduct as one single day of violation, thereby preventing a court from imposing over $10,000 in penalties for a full month of substantial discharges. Such a limitation does not strike this Court as a sensible one, much less as consistent with the statute.

Ultimately, the district court has discretion to determine the appropriate penalty under Section 1319(d) for a day of violation. As the district court noted in *Amoco*, merely because a polluter is subject to $300,000 in penalties for violating a monthly standard does not necessarily mean that those penalties will be imposed. *See Amoco, supra*, 580 F.Supp. at 1045. The $300,000 is a maximum penalty under the statute, not a mandatory one. *See* 33 U.S.C. § 1319(d). Thus, the district court can consider any appropriate factors in arriving at a penalty. But it ought not to have its hands tied, when crafting a penalty for a violation of a monthly limitation, by a $10,000 limit.

sponse because they said "$10,000 per violation" instead of "$10,000 per day of each violation." But such an event, parties' responses to interrogatories do not preclude this Court from imposing appropriate penalties.

**13.** Gwaltney also suggests that its violations of a monthly average cannot be presumed to be a violation during every day of the month, because the average may be computed based on measurements taken less frequently than every day. The Court recognizes that Gwaltney's permit requires it to monitor many of its discharges only three days per week, rather than every day. But even though those periodic tests do not establish with absolute certainty that Gwaltney's actual monthly average exceeded the permitted amount, it is nevertheless reasonable to presume that they do establish such a monthly violation—especially in light of Gwaltney's failure to introduce more accurate evidence to the contrary.

*B. Maximum penalty per day where multiple violations occur within a day.* In some instances, Gwaltney violated discharge limitations for several substances on the same day. Gwaltney argues that the Clean Water Act limits its liability to $10,000 per day, regardless of the number of its violations on a given day. Plaintiffs, on the other hand, argue that the Act only limits a permittee's liability to $10,000 per day per violation of the discharge limitations on a given substance.

The relevant statutory provision states that:

> Any person who violates ... any permit condition or limitation [implementing any of several enumerated sections of the Clean Water Act, in a permit such as Gwaltney's NPDES permit] ... shall be subject to a civil penalty not to exceed $10,000 per day of such violation.

33 U.S.C. § 1319(d). There is no question here that Gwaltney's NPDES permit is a type of permit encompassed under this subsection. Nor is there any question that all of the limitations at issue in Gwaltney's permit are limitations implementing sections of the Clean Water Act enumerated in Section 1319(d). The parties merely dispute the proper construction of the phrase "$10,000 per day of such violation."

Gwaltney relies on *United States v. Detrex Chemical Industries, Inc.,* 393 F.Supp. 735 (N.D.Ohio 1975). In that case, the district court rejected the view that 33 U.S.C. § 1319(d) can be read to authorize "$10,000 per violation per day." *Id.* at 738. The district court first concluded that the statutory language is ambiguous. *See id.* at 736. It next reviewed the legislative history and found references to the Act's authorizing penalties up to "$10,000 per day" and "$10,000 per day of violation," without any use of the words "of such violation." *See id.* at 737. It also concluded that $10,000 per day as an absolute maximum provides an adequate deterrent, and is consistent with other provisions of the Clean Water Act. *See id.* at 736–37.

Plaintiffs suggest that the appropriate reading of Section 1319(d)—and what the *Detrex* court intended—was that Section 1319(d) establishes a maximum daily penalty of $10,000 for violating the limitations on any given *substance*, not an absolute daily maximum. For example, if a polluter violates its limitations for fecal coliform as well as for TKN on the same day, it is subject to a maximum civil penalty of $20,000, not $10,000. On the other hand, if the polluter violates two different limitations—such as the monthly average and the daily maximum—for TKN only, on a given day, it is subject to no more than $10,000 in civil penalties for that day of violation. They rely on *dicta* in a recent district court case, *United States v. Amoco Oil Co.,* 580 F.Supp. 1042, 1046–47, 1047 n. 1 (W.D.Mo. 1984) to support their belief that the *Detrex* holding can be harmonized with this construction of Section 1319(d), and that this construction is indeed the correct one. In *Amoco,* the district judge remarked that "a good argument can be made for the idea that violations of the daily limit for two or more *different effluents* should be subjected to separate penalties." *Id.* at 1047 n. 1 (emphasis original).

The Court does not believe that *Detrex* can be harmonized with the plaintiffs' and the *Amoco* court's construction of Section 1319(d). Indeed, the district judge in *Amoco* acknowledged that "there are indications" that *Detrex* cannot be harmonized with his own (and plaintiffs') preferred construction. *Amoco, supra,* 580 F.Supp. at 1047 n. 1. In order to harmonize the two, plaintiffs correctly point out that the reported opinion in *Detrex* does not indicate whether the multiple violations per day that were at issue involved the same substance or different ones. They suggest that the "multiple per day violations" that the case addressed may have involved repeated violations on the same day of an hourly limitation for a single substance. This may be true, of course. But whether or not the facts were as limited as plaintiffs suggest, the *Detrex* court clearly contemplated the issue in terms of an absolute maximum penalty per day, regardless of whether the limitations violated were for the same or different substances:

> .... a $10,000 per day civil penalty, regardless of the number of violations of

§ 1311, 1312, 1316, 1317, or 1318 of Title 33 or of any permit condition or limitation or of any order of the E.P.A. more than adequately effectuates the Congressional purpose of a "real" threat of sanction.

*Detrex, supra,* 393 F.Supp. at 738.

The Court concludes that the *Detrex* court's construction is the appropriate one. Section 1319(d) authorizes a maximum of $10,000 per day in civil penalties for violations that are enumerated therein, even where the defendant has violated discharge limitations for several substances during the same day.

In view of the contrary suggestion in *Amoco,* it may be helpful to explain the Court's reasoning further. As the *Detrex* court remarked, the statute itself is ambiguous. To elaborate on this, the words "$10,000 per day of such violation" may be read, as plaintiffs would suggest, to mean "$10,000 per day per each violation." On the other hand, the words may also be read as indicating how the number of days for a maximum civil penalty of $10,000 can be imposed should be computed: that is, to clarify that the maximum civil penalty may be imposed for each day of an enumerated violation—rather than, for example, being limited to the day on which a violation is reported, or to the day on which the Administrator gives an order that the defendant violates, or to the days on which the defendant violates some provision of the Clean Water Act beside the enumerated ones. All of these alternate readings may have been at least arguable if the statute had ended with the words "$10,000 per day," omitting the words "of such violation."

In view of the ambiguity in the statute itself, the *Detrex* court examined the legislative history and found several indications that Congress intended to authorize an absolute daily maximum. *See Detrex, supra,* 393 F.Supp. at 737. The Court need not elaborate further on this point, nor on the other reasons for this construction that *Detrex* discusses. Plaintiffs do not raise any

persuasive reasons for choosing their construction over the one that Gwaltney has offered and that the *Detrex* court and this Court find to be correct. Their primary argument is based on the language of Section 1319(d) itself and the fact that the *Amoco* court, in *dicta,* suggested the same reading based on that language. As the Court has already demonstrated, however, that language is amenable to various other readings as well. Plaintiffs provide no legislative history in support of their position. And their primary policy argument is that deterrence is better effectuated by their position. This, however, is unclear. A maximum penalty of $10,000 per day may amount to a substantial deterrent against violations by even the largest corporations where more than a few days of violation are involved, as will become clear *infra.* The Court is satisfied that its construction of Section 1319(d) accurately reflects the intent of Congress.

*C. Maximum civil penalty applicable to Gwaltney.* In light of the foregoing principles for calculating days of violation, the Court is now able to determine the number of days for which Gwaltney is, in its view, subject to a $10,000 maximum penalty. The parties have stipulated to the number of violations, based on Gwaltney's DMRs from November, 1981 to August, 1984. Copies of the DMRs themselves are also in evidence. The DMRs reflect which of the stipulated violations involve monthly limitations, and which ones involve daily limitations. The Court has summarized Gwaltney's violations in Appendix A.

■ During twenty-two of the thirty-three months for which are in evidence, Gwaltney violated the monthly average for at least one substance. During these same months, Gwaltney almost always violated more than one daily maximum or monthly average limitation. But under the principles discussed above, Gwaltney is subject to no more than $10,000 per day of violation, regardless of how many violations occurred on that day. There were 653 days in those twenty-two months; [14] thus, there

---

**14.** Actually, a total of 669 days are in the twenty-two months involved. The parties have stipulated, however, that during the last of those 22

were 653 days of violation. For those days of violation, Gwaltney is subject to a maximum penalty of $6,530,000.

In addition, Gwaltney violated daily limitations during five months when it reported no violation of monthly averages. In July 1982 it violated two limitations; it also violated two limitations during each of the three months following. Finally, Gwaltney violated five daily maximum limitations in February, 1984, making a total of 13 violations of daily standards during months when no violations of monthly averages occurred.

The DMRs do not indicate on which day of the month a given violation occurred, however. Therefore, it is impossible for the Court to discern whether any of these daily violations occurred on the same days. Conceivably, there were as few as seven different days of violation.[15] Plaintiffs have not demonstrated that each of these thirteen violations of daily standards occurred on different days.

The Court nevertheless believes that it is reasonable to presume that each of these did occur on a different day. Gwaltney has contended throughout this litigation that it is subject to a maximum penalty of $10,000 for a given day of violation, regardless of how many violations occurred on that day. Gwaltney also has complete access to any relevant records, so that it could have presented evidence to show that any of the violations occurred on the same day, if such evidence indeed existed. In the absence of such evidence, the Court concludes that Gwaltney's violations during these five months occurred on thirteen different days. These violations increase Gwaltney's maximum liability in civil penalties by $130,000. Adding this to the maximum penalty for the months when Gwaltney violated month-

ly standards, $6,660,000 is the maximum civil penalty to which Gwaltney is subject.

*IV. Gwaltney's Penalty.*

As the Court has already discussed, the penalty of $10,000 per day of violation authorized by Section 1319(d) is a maximum penalty, not a mandatory one. The Court now faces the task of determining the actual penalty, within the statutory limits, that Gwaltney shall be assessed. The parties differ markedly on this point. Plaintiffs urge the Court to impose the statutory maximum: here, as the Court has discussed, over $6,000,000. Gwaltney argues that a far smaller amount ought to be assessed: somewhere between $12,000 and $20,000.

Despite their widely varying estimates of the appropriate penalty, the parties agree that the United States EPA's civil penalty policy, *see* Environmental Protection Agency Civil Penalty policy, [Federal Laws] *Env't Rep.* (BNA) 41:2991 (June 1, 1984) (hereinafter cited as "EPA Penalty Policy"), is an appropriate guideline for determining the amount of Gwaltney's penalty. Neither of the parties argue that the policy binds the Court. Nor indeed does it. Nevertheless, both parties suggest—and the Court agrees—that EPA's penalty policy provides a helpful analytical framework for arriving at a civil penalty. It is especially useful in light of the substantial maximum penalty that the statute authorizes, on the one hand, and the total absence of guidance Congress has provided in assessing penalties pursuant to Section 1319(d), on the other hand. *Cf.* Clean Water Act § 311(b)(6), 33 U.S.C. § 1321(b)(6) (in determining the amount of the penalty for types of violations of the Clean Water Act not at

---

months—May, 1984—no violations occurred after May 15. Accordingly, the Court has treated Gwaltney's violation of its May, 1984 monthly average for TKN as involving only 15 days of violation.

**15.** In July 1982, for example, there was one fecal coliform violation and one chlorine violation. Those violations could have occurred on the same day, because tests for fecal coliform were performed three times per week, and tests

for chlorine were performed hourly, according to the DMRs. Each of the two reported chlorine violations in August, September, and October, 1984, could have occurred on the same day because chlorine was tested on an hourly basis.

In February 1984, the single TKN violation and the two fecal coliform violations could have occurred on the same days as the three oil and grease violations. Tests for all three substances were performed three days per week, according to the DMRs.

issue in this case, the following factors shall be considered: the size of the business involved; the effect of the penalty on the businesses' ability to continue; and the gravity of the violation). Finally, there are few cases that explain in any detail how they arrive at a penalty amount under Section 1319(d).

A. *The EPA Penalty Policy.* The policy aims at two general goals: (i) deterrence; and (ii) "fair and equitable treatment of the regulated community." *See* EPA Penalty Policy, 41:2992–93. As for deterrence, the policy recognizes that both deterrence of future violations by the violator (specific deterrence) and by other regulated firms (general deterrence) is important. *See id.* at 41:2992. For deterrence purposes, the policy recommends a penalty that includes two components. First, it should include the "economic benefit of non-compliance"; otherwise, the violator and potential violators would perceive that it pays to violate the law, creating an obvious disincentive for compliance. *See id.* Second, the penalty should include an additional amount, which the policy characterizes as a "gravity component." If the penalty were limited to the economic benefit of non-compliance, regulated firms would find that they would have nothing to lose by non-compliance because a penalty for their violations would make them no worse off than if they had complied in a timely way. *See id.* The policy suggests that the gravity component reflect both the seriousness of the violation and—where extensive non-compliance with a regulatory program exists in an area—an additional amount to promote general deterrence purposes. *See id.*

Once an appropriate penalty for deterrence purposes has been estimated, the policy recommends that this "preliminary deterrence amount" be adjusted to ensure that the "regulated community" is fairly treated. *See* EPA Penalty Policy at 41:2992. The policy identifies a variety of factors that ought to be accounted for in arriving at a final civil penalty. Such factors include the degree of willfulness or negligence involved, the degree of cooperation involved, the violator's history of non-

compliance, and whether the penalty would force the violator out of business. *See* EPA Penalty Policy at 41:3000–02.

B. *Gwaltney's violations.* Although the parties have stipulated to over 160 different violations involving five different substances, the Court shall consider two distinct compliance problems in arriving at Gwaltney's penalty. Each problem related to a specific pollution control method at the plant. Inadequacies in one method or the other account for virtually all of the violations at issue here.

1. *Chlorination problems.* From November, 1981 to October, 1982, Gwaltney experienced problems with its chlorination process. These problems caused Gwaltney's violations of its fecal coliform and chlorine limitations during that time. Fecal coliform, a type of microbe associated with human and animal feces, is a good indicator of the safety of water for drinking, swimming, and shellfish harvesting. Gwaltney's permit includes both monthly average and daily maximum limitations on its discharges of fecal coliform. Chlorine is a toxic chemical that the state requires Gwaltney to use—in appropriate concentrations—to kill fecal coliform. Chlorine also kills other life forms where its concentration is high enough, however. Thus, Gwaltney's NPDES permit imposes daily maximum as well as minimum limitations on the concentration of its chlorine discharges. From July, 1981 (before Gwaltney bought the plant) until October, 1982, the plant chronically violated its permit limits for fecal coliform and chlorine. These violations were due to both insufficient and excessive exposure of Gwaltney's wastewater to chlorine.

Gwaltney knew that its plant had a chlorine problem prior to purchasing the plant from ITT–Gwaltney in October, 1981. ITT–Gwaltney had taken the initial step of purchasing a new chlorinator, which Gwaltney believed would correct the chlorine and fecal violations. After a period of nearly one year from the takeover date, Gwaltney finally resolved the chlorination problems at its plant. At no time did Gwaltney seek

outside assistance from independent consultants in analyzing the causes or the extent of its chlorination problems.

a. *Economic benefits.* The Court first considers the economic benefits that accrued to Gwaltney as a result of the delay in the plant's having a chlorination system that would meet the chlorine and fecal coliform limitations. The Court feels compelled to ensure that Gwaltney receives no economic benefit whatever from its delay in having a properly operating chlorination system.

Determining with precision a firm's economic benefit from noncompliance is not a simple matter. As EPA's penalty policy points out, there are at least three distinct types of economic benefits that a violator may enjoy as a result of its violation. *See* EPA Penalty Policy at 41:2996–97. First, by delaying the expenditure of funds on compliance, a violator obtains the use of the money for other purposes in the meantime. Second, a violator may also avoid some costs altogether—for example, the costs of maintaining and operating the pollution control system until it is implemented. Third, a violator may, in addition, obtain a competitive advantage as a result of its violation—for example, it may be able to offer goods at a lower price, thereby possibly increasing its sales and profits. While these different types of benefit are not difficult to understand in the abstract, determining their amounts is more complicated. Indeed, proving the extent of some of these types of economic benefits will often be impossible; thus, any objective formulation of economic benefit is likely to underestimate that benefit. The Court need not painstakingly determine such an amount, however. The purposes behind including an economic benefit component in a penalty assessment are to ensure that the violator disgorges at least its economic benefit, while also providing some objective basis for at least part of the penalty assessment. In light of these purposes and the difficulty of demonstrating all elements of economic

benefit, the Court shall incorporate any objective evidence to arrive at what it hopes is a rational estimate of Gwaltney's economic benefit, resolving uncertainties in favor of a higher estimate.

Gwaltney offered evidence addressing primarily the first type of economic benefit: the benefit accruing from delaying its expenditures. Gwaltney indicated that its net cost for the changes in the chlorination system was $11,560. This amount is undisputed. In order to determine Gwaltney's economic benefit from delaying its expenditure, one must also know the length of the delay and the value of not incurring that expenditure.

Gwaltney attempted to demonstrate at trial that it could not have implemented the necessary improvements in the chlorination system any more than four months earlier than it actually did. Gwaltney argues that its economic benefit from delay should therefore be computed based on this four-month period. The Court, however, believes that the period of benefit for computing the economic benefit of delayed compliance should run for the entire time during which the violator is out of compliance because of its chlorination problems: here, twelve months. The Court recognizes, of course, that Gwaltney· could not have accomplished the necessary changes instanteously upon discovering the chlorination problems.· Indeed, Gwaltney's suggestion that six months was an appropriate, reasonable period for implementing a fully complying chlorination system may be correct. But this does not change the fact that if the expenditures had been made in time to prevent any violations at all, then Gwaltney would have incurred all the expenditures prior to the non-compliance period.[16] The Court also notes that its approach for computing the benefit period comports with that of the EPA's penalty policy. *See* EPA Penalty Policy at 41:2996.

Gwaltney argues that its actual rate of interest on borrowed funds during this pe-

---

16. The fact that in the circumstances of this case another firm—ITT–Gwaltney, rather than defendant—owned the plant at the time such expenditures would have been incurred does

not alter this conclusion. Presumably the cost of such improvements would have been reflected in the sale price that defendant would have paid for the plant.

riod should be used to calculate its economic benefit from delayed compliance. It adduced evidence that during the relevant period this rate was 13%. Plaintiffs, on the other hand, computed Gwaltney's economic benefit from delay using a rate of 18.17%, which is the ten-year rate of return on equity earned by Smithfield Foods, Inc.—Gwaltney's parent corporation. At least in these circumstances, the Court believes that 13%—the actual interest rate Gwaltney itself paid on borrowed funds—is a more accurate basis for determining Gwaltney's economic benefit from delay.[17]

Given Gwaltney's rate of interest, its period of delayed compliance because of chlorination problems, and the amount of investment involved, the Court can determine at least the portion of economic benefit accruing to Gwaltney because of the delay in expending funds on the chlorination system. That amount is approximately $1,500.[18] While this amount is probably less than Gwaltney's total economic benefit, the Court has no basis for rationally arriving at a figure any larger. In view of the rest of the penalty that Gwaltney shall be assessed, however, the Court has no doubt that Gwaltney shall disgorge any economic benefit of its non-compliance.

*b. Gravity component.* Gwaltney argues that there is no reason to impose a penalty with an adjusted gravity component of more than $4,900. Gwaltney's suggested gravity component covers all the violations at issue in this case, including its violations resulting from its chlorination problems.

The actual and potential environmental harm associated with a violation is an important factor, under the EPA's penalty policy, in arriving at the gravity component. *See* EPA Penalty Policy at 41:2999. The Court agrees. In connection with the environmental harm of its fecal coliform violation, Gwaltney recognizes that the presence of fecal coliform has led the state to generally prohibit the taking of shellfish for human consumption from much of the Pagan River. Gwaltney attempts to minimize the seriousness of its fecal coliform violations, however, by pointing out that the state—in certain circumstances—nevertheless allows oysters and clams from those same parts of the Pagan River to be sold for human consumption in their uncooked state. Further, Gwaltney argues that the Pagan River's condition with respect to fecal coliform could not be improved for shellfish harvesting even if Gwaltney constantly complied with the fecal coliform limitations in its permit. Gwaltney also attempts to minimize the seriousness of its fecal coliform violations by noting that the State has not absolutely

---

**17.** Plaintiffs cite *Ohio ex rel. Brown v. Dayton Malleable, Inc.,* 13 E.R.C. 2189, 2194 (Ohio Ct.C. P.1979), *aff'd,* 1 Ohio St.3d 151, 438 N.E.2d 120 (1982), for the proposition that the historic return on equity is the appropriate rate. But in that case, which involved penalty assessments under an Ohio water pollution statute, apparently no one contended that the defendant's own rate of interest ought to be used. Rather, the choice before the Court was between the polluter's actual rate of return and "some outside standard." *Dayton Malleable,* 13 E.R.C. at 194. The Court rejected the latter. Here, plaintiffs' proposed rate—not the rate proposed by Gwaltney—is more accurately described as the "outside standard": it is based on the parent's rate of return; not Gwaltney's; and it runs over a ten-year period, not the years in question.

**18.** Gwaltney's annual rate of return (13%) multiplied by the amount of investment involved ($11,560) multiplied by the number of years of non-compliance (1.0).

In its proposed calculations, Gwaltney, like the Court, calculates its benefit from delay on the entire amount of investment involved: $11,560. Gwaltney claims that this is a generous concession on its part, because the money was actually expended over the course of the improvements, which while the calculation is based on the fiction that the money was spent in a lump sum at the end of the improvements—facilitating the computation but distorting the reality. The Court agrees that a fiction is involved, but disagrees that it distorts Gwaltney's economic benefits from delay. If the expenditures had been incurred in time to improve the system before the violations occurred, it is reasonable to presume that each of the expenditures would have been incurred about a year before it was actually incurred. Thus, it is appropriate to calculate Gwaltney's benefit on the entire amount expended based on one year's time.

forbidden the discharge of fecal coliform; rather, the State has only limited such discharge.

In the Court's view, Gwaltney trivializes the seriousness of its fecal coliform violations. To begin with, an EPA summary of the effects of the fecal coliform indicates that increased levels of fecal coliform in waters used for recreational swimming and shellfish harvesting pose health hazards to human beings, and act as a medium of disease transmission for a variety of diseases.[19] In light of this, the Court finds Gwaltney's characterization of its violations as posing "no threat whatever to the public health" to be nothing less than offensive.

Further, the Court notes that Gwaltney's fecal coliform violations were not *de minimus.* Gwaltney violated its daily maximum—by four to seven times the permitted amount—on at least six occasions, according to the DMRs; and during five out of the seven months when Gwaltney exceeded its monthly average for fecal coliform, it exceeded the monthly average by 58% to 150%. Finally, the Court notes that Gwaltney experienced fecal coliform problems almost continuously from November, 1981 to July, 1982. It is true, of course, that the Pagan River was not a virgin stream before Gwaltney exceeded its permit limitations for fecal coliform; Gwaltney's fecal coliform violations were not responsible for spoiling the river. But the fact that a river already suffers from poor water quality hardly excuses a polluter's violation. Indeed, in view of the fact that the Clean Water Act aims to restore the waters of the United States as well as to prevent the degradation of unpolluted waters, *see* 33 U.S.C. § 1251, violations that impede the restoration of water quality ought not to be treated lightly. Considering all these factors, the Court believes that the "gravity component" of Gwaltney's penalty

should include $4,000 per day of fecal coliform violations arising out of Gwaltney's chlorination problems. A total of 213 days are involved.[20]

Gwaltney's problems with its chlorination system resulted in violations of its chlorine standards as well as of its fecal coliform standards. The parties have stipulated that at least half of Gwaltney's 34 chlorine violations involved minimum standards, however, not maximum ones. The only possible harmful environmental effect from violating a minimum chlorine standard, according to the evidence, is that fecal coliform limitations may be exceeded. The Court has already considered the environmental harm from Gwaltney's fecal coliform violations. It sees no reason to increase the gravity component because of Gwaltney's violations of its minimum chlorine standards.

Gwaltney's violations of its maximum chlorine standards are a different matter, though. Chlorine is a toxic pollutant, and in certain concentrations kills a variety of marine life. Gwaltney correctly points out that it is required to use chlorine in its waste-water treatment and has even been required to maintain a minimum level of chlorine in its effluent. Gwaltney also points out that apparently no fish kills on the Pagan River occurred during the entire period of its non-compliance. The Court nevertheless believes that a non-trivial amount should be added to the gravity component of Gwaltney's penalty to account for its chlorine violations. The gravity component should account for risk of environmental harm as well as for any actual environmental harm. During ten of the twelve months when Gwaltney experienced problems with its chlorination system, it exceeded its maximum chlorine limitations on some seventeen occasions. Although most of these violations were not grossly excessive,[21] two involved dis-

---

**19.** This EPA summary is a joint exhibit to which the parties stipulated.

**20.** Gwaltney violated its monthly average for fecal coliform in November and December, 1981, and from February to June, 1982; it also violated daily maximums on one occasion in

January, 1982 and on one occasion in July, 1982. This amounts to 213 days of violation.

**21.** Gwaltney's permit allowed discharges with a maximum chlorine concentration of 2.5 mg./1. and a minimum of 1.5 mg./1. It appears that 11 of Gwaltney's 17 violations of its maximum

charges that were double the permitted concentration. Considering these factors, the Court deems it appropriate to include in the gravity component of Gwaltney's penalty an amount of $1,000 for each of the seventeen days of violation of its maximum chlorine limitation.

■ *c. Adjustments.* Gwaltney argues that its penalty ought to be adjusted downward to account for a variety of factors. Under EPA's civil penalty policy, a violator's willfulness or negligence—or lack thereof—is one factor to consider in arriving at a final penalty amount. *See* EPA Penalty Policy at 41:3000. Of course, liability under Section 1319(d) is strict. *See, e.g. United States v. Amoco, supra,* 580 F.Supp. at 1050. But willfulness is nevertheless relevant to the amount of penalty. *See id.*

Gwaltney argues that its conduct should not be characterized as willful merely because it did not shut down its facility in the face of admitted knowledge that chlorination problems at its plant were causing permit violations even before Gwaltney took over the plant. In support of that proposition, Gwaltney suggests that it had no "absolute statutory obligation" to close its plant or slow its production, absent "imminent and substantial endangerment to health or welfare." Gwaltney's premise does not support its conclusion, however. Even if it had no "absolute statutory obligation" to close its plant or slow its production, Gwaltney's failure to take any such measures, in the face of undisputed knowledge that continued operation would result in continued violations, reflects a certain degree of willfulness. The Court need not decide whether it is the sort of willfulness that ought to result in an increased penalty, though, because the evidence reflects that Gwaltney dealt with its chlorination problems in an exceedingly unconcerned manner. While Gwaltney may not have had any control whatever in the chlorination problem's first arising, it did exercise considerable control over the time involved in correcting that problem, and its attitude borders on benign neglect.

The first shipment of parts for the new chlorinator that Gwaltney believed would solve its problems did not arrive until December, 1981; yet, the problem had arisen in August, and ITT–Gwaltney had ordered the parts in September. The record does not reflect any effort by Gwaltney to speed up the arrival. A crucial component for maintaining the proper chlorine flow—an automatic valve—was missing from the December shipment and had to be back-ordered; this part did not arrive until March 16, 1982. The record does not reflect any efforts by Gwaltney to speed up this arrival, either. Every witness who was asked indicated that the chlorination problems arising from the lack of an automatic valve could have been handled manually. It would not have been easy—but it was possible. The record does not reflect any special effort by Gwaltney to control the problem manually. Further, Gwaltney's engineers suspected—correctly, as it turned out—other problems with the chlorination system besides the chlorinator itself. A supplier first sent the wrong dyes for testing those suspicions. Gwaltney did not obtain the proper dyes until ten days later, despite virtually uncontradicted testimony that the necessary dye is commonly available. Through all this, Gwaltney did not seek any outside advice to assist it in determining the precise nature and extent of its chlorination problems.

Contrary to Gwaltney's contentions, the Court believes that Gwaltney's penalty ought to be increased, not reduced, because of willfulness. Gwaltney's lackadaisical approach in correcting a problem that posed risks—albeit not "imminent" ones—to both human health and aquatic life should not be countenanced. One may speculate how long Gwaltney would have taken to repair a machine the faulty operation of which would have halted production. It is reasonable, in the Court's view, in conclude that at the very least Gwaltney would have exerted more effort to repair such a machine than it did to bring its discharges into compliance with pollution

chlorine limitations involved discharges with a

chlorine concentration under 3.2 mg./1.

standards. Gwaltney acknowledges that the evidence supports the conclusion that it could have reduced the compliance time by 125 days. The Court agrees, and shall increase the penalty by $1,000 per day that Gwaltney could have eliminated in correcting the problem.

Gwaltney argues that its penalty should also be reduced because of its cooperation in controlling its chlorination problem.[22] It is apparently true that Gwaltney corrected its chlorination problems without the threat of a lawsuit from anybody to prod it along. In that sense, Gwaltney was not uncooperative. But the Court finds it inappropriate to give Gwaltney credit for correcting violations for which Gwaltney plainly knew it was responsible.

Gwaltney's final argument for reducing any penalty it will be assessed is its purported inability to pay a substantial penalty. EPA's penalty policy is, generally, not to request a penalty that is "clearly beyond the means of the violator." *See* EPA Penalty Policy at 41:3002. Gwaltney characterizes its own "profit margin" as "extremely thin." It suggests that its penalty should be fashioned in light of this fact. The Court disagrees, being unpersuaded that any penalty warranted by Gwaltney's violations would jeopardize Gwaltney's continued operation.[23]

■ In light of Gwaltney's economic benefit, the gravity component, and appropriate adjustments, Gwaltney's total penalty for the violations arising out of its chlorination problems is $995,500.[24]

*2. Biological treatment system.* Gwaltney's second source of compliance problems was its biological treatment system. Inadequacies in that system led to repeated violations of Gwaltney's TKN limitations during the winter months early in 1982 and the winter months of 1982–83. Gwaltney also experienced violations of its permit limitations for TKN and other substances during the winter and spring of 1983–84, in connection with the start-up of its new biological treatment system.

TKN is a nitrogen compound that can degrade a river by depleting its oxygen supply. Natural chemical and biological processes, involving TKN and bacteria in the river, transpire after TKN is added to a river. Those processes consume the dissolved oxygen in a river, to the detriment of many forms of river life. Gwaltney knew before it purchased the plant that its biological treatment system had resulted in TKN violations the previous winter. It did not take any steps of its own to address the problem until late May, 1982—well after it experienced TKN violations during the first winter that it was operating the plant. Over the following two years, in conjunction with the advice and approval of a consulting firm and the State Water Control Board (SWCB), Gwaltney devised and implemented a variety of changes in its biological treatment system. It submitted a proposed plan to the SWCB on January 5, 1983, which the SWCB approved on May 31 of the same year. By mid-October, construction was completed. Although Gwalt-

---

**22.** Gwaltney also suggests that its cooperation is reflected by its self-reporting of violations, and intimates that under EPA's penalty policy this should result in a mitigation of its penalty. Gwaltney is legally required to report its violations, however *see supra* note 3. Thus, the Court shall not mitigate Gwaltney's penalty on account of its self-reporting. This approach accords with EPA's policy. *See* EPA Penalty Policy at 41:3000 (*"assuming such self-reporting is not required by law,* such behavior should result in the mitigation of any penalty.") (emphasis added).

**23.** Although Gwaltney's income statement for the year ending April 29, 1984, reflects an after-tax loss of $247,000, this loss must be considered in light of Gwaltney's extraordinary loss during the same year of 1.8 million dollars on

the disposition of a plant. Gwaltney is clearly earning a substantial dollar amount on its operations, regardless of whether its profit margin is "thin."

**24.** This amount is computed as follows:

| | |
|---|---|
| —economic benefit: | $ 1,500 |
| —gravity-fecal coliform ($4,000 × 213 days of violation): | 852,000 |
| —gravity-chlorine ($1,000 × 17 days of violation of maximum limit): | 17,000 |
| —adjustment for delay ($1,000 × 125 days of delay): | 125,000 |
| | $995,500 |

ney experienced a number of violations during the system's start-up period, it experienced no violations after May 15, 1984, up to the time of trial in mid-December, 1984. Some experts did testify, though, that they were uncertain whether the new system would meet the permit limitations for TKN during the remainder of the winter.

*a. Economic benefit.* As with its chlorination system, the only evidence about Gwaltney's economic benefit from non-compliance concerns the value of delaying the necessary expenditures. Gwaltney's evidence is that its expenditure amounted to $159,745. The Court's computation of Gwaltney's economic benefit shall be based on this amount.[25]

The period over which a violator's economic benefit should be computed runs from the date of non-compliance until the date of compliance, or the date on which compliance may reasonably be expected, as discussed above. The compliance problems arising out of the plant's biological treatment system commenced, for Gwaltney, in January 1982. They were not rectified until May 15, 1984.[26] This is a period of two years and over four months, or 2.37 years.

The rate at which Gwaltney benefited from the delay, as discussed *supra,* is 13%. Given such a rate, as well as the amount of expenditures involved and the period of benefit, Gwaltney's benefit from delaying expenditure is $54,022.[27]

*b. Gravity component.* As mentioned *supra,* in connection with the chlorination problems, Gwaltney argues that the gravity component of its penalty for all its violations, including those caused by its biological treatment system, should not exceed $4,900, when adjusted. With respect to the numerous TKN violations resulting from the problems with its biological treatment system, Gwaltney argues that the great majority were utterly innocuous from an environmental standpoint because TKN is not toxic, because the Pagan River is improving, and because most of the discharges occurred in the wintertime.

Some of its points are relevant to penalty considerations, although Gwaltney overstates its case. Gwaltney correctly points out that the presence of TKN in a river does not affect human health, according to the evidence. But it does have undeniable implications for the river's dissolved oxygen content, which is related to the environmental quality of the river.[28] While

25. Plaintiffs argue that Gwaltney's benefit from delayed expenditures should be based on a much larger amount. They point out that Gwaltney's consultants outlined a "permanent solution" to Gwaltney's biological treatment problems, at an estimated cost of $506,000, and that Gwaltney chose instead to implement a modified version of the "interim solution," which was considerably less expensive. Plaintiffs argue that Gwaltney's economic benefit constitutes the difference between the "permanent solution" and the amount Gwaltney actually expended.

This approach is incorrect. Gwaltney's benefit from delaying expenditures is the benefit from delaying those expenditures that eare necessary to achieve compliance. Gwaltney appears to have achieved compliance on the expenditures it has already incurred on its biological treatment system.

Although some of the testimony suggests that the modifications Gwaltney made in its treatment may not result in compliance with its TKN limitations, the Court believes it would be too speculative to reach that conclusion on the present record.

26. The Court is aware that the evidence raises some question whether Gwaltney had permanently corrected its TKN problems by May 15, 1984, even though it experienced no further violations after that date; or whether instead Gwaltney would again experience TKN violations during the coldest winter months. As indicated *supra* note 21, the Court believes that such a conclusion would be too speculative, given the present record.

27. This amount is based on yearly compounding, computed as follows:

| | |
|---|---|
| 1982: ($159,745 × .13/yr × 1 yr = | $20,767 |
| 1983: ($159,745 + $20,767) × .13/yr × 1 yr = | 23,467 |
| 1984: ($159,745 + $20,767 + $23,467) × .13/yr × .37 yr = | 9,811 |
| TOTAL: | $54,045 |

28. Gwaltney also suggests that its TKN discharges have little effect on the environment

none of the evidence reflects specific environmental damage resulting from Gwaltney's TKN violations, the Court does not believe that it should blind itself to those violations as a result.

Nor does the Court believe that Gwaltney's penalty should be mitigated because the Pagan River's condition is generally improving. Gwaltney's violations may have contributed to delaying that improvement. Compliance incentives would be undermined if polluters believed that their violations would not be treated seriously where environmental regulations have generated some improvement in the environment.

The Court does recognize, however, that Gwaltney's TKN violations during the winter months posed less environmental risk than summer violations. The process by which TKN depletes the river's oxygen slows down substantially with the colder winter temperatures. Plaintiffs point out that the Pagan River's tidal nature may inhibit the flushing of TKN from the river—raising the possibility that even winter TKN discharges may lead to oxygen depletion during warmer months. Nevertheless, the risk is certainly diminished. In the Court's view, fairness dictates that Gwaltney's winter TKN violations should be treated less harshly than its summer TKN violations. An appropriate penalty is $250 per day of violation for TKN violations during the months of November through April. For violations during the remaining months of the year, a penalty of $1,000 per day of TKN violation is appropriate.

*c. Adjustments.* An important factor is the willfulness involved in a compliance problem. Gwaltney concedes that it could have begun addressing the problems in its biological treatment system substantially earlier. One major delay was that Gwaltney did not contact a consultant immediately upon experiencing unexpected TKN compliance problems in the winter of 1981–82;

rather, it waited until late May, 1982, to do so. Gwaltney has submitted evidence that this—and other unnecessary delays it could have prevented—totaled 283 days. The Court concludes that this number is a reasonable approximation.

Gwaltney's penalties should be adjusted upward for each day of these controllable delays, just as its penalties were adjusted upward for the controllable delays in implementing a properly functioning chlorination system. The adjustment should not be as substantial, however, because the violations resulting from the problems in the biological treatment system appear to be less serious than those resulting from the chlorination problems. Further, there do not appear to be any human health implications from the poorly functioning biological treatment system, unlike the situation with the malfunctioning chlorination system. In the Court's view, this makes the controllable delays in implementing a properly functioning biological treatment system less culpable. The Court concludes that an amount of $250 per day of delay in addressing the problems with the biological treatment system is an appropriate adjustment to the penalty.

The Court believes that Gwaltney's penalty should be adjusted downward as well as upward due to the amount of willfulness involved in the violations arising out of its biological treatment system. According to the evidence, Gwaltney's violations after starting up its new system were largely uncontrollable; there is no way to start up a biological treatment system without violations. A biological treatment system is apparently the best sort of system, overall, for a plant such as Gwaltney's. There is no evidence that Gwaltney's start-up period was greater than one would expect. The Court shall therefore account for the violations of Gwaltney's various permit limitations during its start-up period by assessing $50 per day per violation of the limita-

---

because of the point on the Pagan River at which they occur. Testimony did indicate that the discharges are slightly down-river from a "critical point" for dissolved oxygen in a SWCB pollution model. But testimony also indicated that tidal action could nevertheless result in

Gwaltney's TKN discharges affecting that critical point upriver. Further, even if Gwaltney's TKN discharges do not affect the critical point, there is no evidence that they have no potentially adverse environmental impacts on other points in the river.

tions on any substance, instead of the higher amounts discussed *supra.*

As indicated in the Court's discussion of Gwaltney's chlorination problem, Gwaltney also seeks to have its penalty adjusted downward to account for its cooperation in resolving its problems prior to litigation, and for its purported inability to pay. The Court has already rejected those arguments *supra,* and it need not address them again here.

In light of the foregoing discussion, Gwaltney's penalty for the compliance problems stemming from its biological treatment system is $289,822. Appendix B elaborates the computation of this amount.

CONCLUSION

Having determined that Gwaltney shall be assessed a civil penalty of $289,822 for violations arising out of the problems with its biological treatment system, as well as $995,500 for violations arising out of its chlorination system, the Court shall impose upon Gwaltney a total civil penalty of $1,285,322.

An appropriate order will issue.

## APPENDIX A

Gwaltney's Violations of NPDES Permit No. VA0002844 (based on DMRs and stipulation of parties), from November 1, 1981 to August 31, 1984.

| Month | Total Suspended Solids (TSS) | | Total Kjeldahl Nitrogen (TKN) | | Fecal Coliform (FC) | | Oil and Grease (O/G) | Chlorine (Cl$_2$) | |
|---|---|---|---|---|---|---|---|---|---|
| | (mo. avg.) | (day max.) | (mo. avg.) | (day max.) | (mo. avg.) | (day max.) | (day. max.) | (day min.) | (day max.) |
| 11/81 | – | – | – | – | 1 | 1 | – | 1 | 1 |
| 12/81 | – | – | – | – | 1 | 1 | – | 1 | 1 |
| 1/82 | – | – | 1 | 5 | – | 1 | – | 1[b] | 6[a] |
| 2/82 | – | – | 1 | 10 | 1 | 3 | – | – | 3 |
| 3/82 | – | – | 1 | 4 | 1 | 3 | – | 1 | 1 |
| 4/82 | – | – | – | – | 1 | 3 | – | 6 | – |
| 5/82 | – | – | – | – | 1 | 3 | – | 1[b] | 2[a] |

[late May/82: Gwaltney contacts consulting firm about its TKN problems.]

| Month | TSS (mo. avg.) | (day max.) | TKN (mo. avg.) | (day max.) | FC (mo. avg.) | (day max.) | O/G (day. max.) | Cl (day min.) | (day max.) |
|---|---|---|---|---|---|---|---|---|---|
| 6/82 | – | – | 1 | – | 1 | 3 | – | 1 | 1 |
| 7/82 | – | – | – | – | – | 1 | – | 1 | – |
| 8/82 | – | – | – | – | – | – | – | 1 | 1 |
| 9/82 | – | – | – | – | – | – | – | 1 | 1 |
| 10/82 | – | – | – | – | – | – | – | 1 | 1 |
| 11/82 | – | – | – | – | – | – | – | – | – |
| 12/82 | – | – | 1 | – | – | – | – | – | – |

[1/5/83: Gwaltney submits plan for improving its biological treatment system to the State Water Control Board (SWCB).]

| Month | TSS (mo. avg.) | (day max.) | TKN (mo. avg.) | (day max.) | FC (mo. avg.) | (day max.) | O/G (day. max.) | Cl (day min.) | (day max.) |
|---|---|---|---|---|---|---|---|---|---|
| 1/83 | – | – | 1 | – | – | – | – | – | – |
| 2/83 | – | – | 1 | 4 | – | – | – | – | – |
| 3/83 | – | – | 1 | – | – | – | – | – | – |
| 4/83 | – | – | 1 | – | – | – | – | – | – |
| 5/83 | – | – | 1 | 1 | – | – | – | – | – |

[5/31/83: SWCB approves Gwaltney's plan.]

| Month | TSS (mo. avg.) | (day max.) | TKN (mo. avg.) | (day max.) | FC (mo. avg.) | (day max.) | O/G (day. max.) | Cl (day min.) | (day max.) |
|---|---|---|---|---|---|---|---|---|---|
| 6/83 | – | – | – | – | – | – | – | – | – |
| 7/83 | – | – | – | – | – | – | – | – | – |
| 8/83 | – | – | – | – | – | – | – | – | – |
| 9/83 | 1 | – | 1 | – | – | – | – | – | – |
| 10/83 | – | – | 1 | 8 | – | 1 | – | – | – |

[10/18/83: Gwaltney's new biological treatment system is completed.]

| Month | TSS (mo. avg.) | (day max.) | TKN (mo. avg.) | (day max.) | FC (mo. avg.) | (day max.) | O/G (day. max.) | Cl (day min.) | (day max.) |
|---|---|---|---|---|---|---|---|---|---|
| 11/83 | 1 | 1 | 1 | 10 | – | – | – | – | – |
| 12/83 | 1 | 1 | 1 | 13 | 1 | 1 | – | – | – |
| 1/84 | – | – | 1 | 9 | – | – | – | – | – |
| 2/84 | – | – | – | 1 | – | 2 | 3 | – | – |
| 3/84 | – | – | 1 | – | – | – | – | – | – |
| 4/84 | – | – | 1 | 3 | – | – | – | – | – |
| 5/84 | – | – | 1 | 1 | – | – | – | – | – |
| 7/84 | – | – | – | – | – | – | – | – | – |
| 8/84 | – | – | – | – | – | – | – | – | – |
| TOTAL | 3 | 2 | 18 | 69 | 8 | 23 | 3 | 16[b] | 18[a] |

[a] at most this number of violations of the maximum chlorine standard.

[b] at least this number of violations of the minimum chlorine standard.

### APPENDIX B

Penalties for Gwaltney's violations arising from its inadequate biological treatment system.

| | |
|---|---:|
| —economic benefit: | $ 54,022 |
| —gravity component: | |
| —pre-start-up TKN violations | |
| .winter '81–'82: 90 days × $250/day= | 22,500 |
| .summer '82: 30 days × $1,000/day= | 30,000 |
| .winter '82–'83: 151 days × $250/day= | 37,750 |
| .summer '83: 61 days × $1,000/day= | 61,000 |
| —start-up violations: (including downward adjustment because start-up is involved) | |
| 296 days (199 days TKN, + 61 days TSS, + 33 days fecal coliform, + 3 days oil & grease) × $50/day= | 14,800 |
| | 166,050 |
| .further adjustments: | |
| .delay: 283 days × $250/day= | 70,750 |
| TOTAL: | $289,822 |